# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *Bank of America, N.A. v. Cannonball LLC*, 2014 IL App (2d) 130858

</div>

| | |
|---|---|
| Appellate Court Caption | BANK OF AMERICA, N.A., as Successor by Merger to LaSalle Bank National Association, Individually and as Authorized Agent, Plaintiff and Counterdefendant-Appellee, v. CANNONBALL LLC; DAVID BOSSY; TARGET CORPORATION; KOHL'S ILLINOIS, INC.; UNKNOWN OWNERS; and NONRECORD CLAIMANTS, Defendants (Home Depot U.S.A., Inc., Defendant and Counterplaintiff-Appellant). |
| District & No. | Second District<br>Docket No. 2-13-0858 |
| Filed<br>Modified upon<br>denial of rehearing | May 29, 2014<br><br>August 5, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action to foreclose plaintiff's mortgage on a shopping center, the trial court erred in entering summary judgment for plaintiff-mortgagee, finding that the lending agreements between defendant, an anchor tenant, and the mortgagor, the developer of the center, under which the tenant had a lien on the developer's mortgaged property that secured the tenant's right to reimbursement from the developer for a portion of the "Special Service Area Tax" imposed by the city in which the center was located to repay bonds the city sold to pay for various on- and off-site improvements did not run with the land and were not binding on the mortgagee or its successors once the developer's property was foreclosed, since the developer and the tenant intended the covenants in the lending agreements to run with the land, the agreements touched and concerned that land, and privity of estate existed between the tenant and the mortgagee based on their mutual relationship. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 10-CH-869; the Hon. Alan W. Cargerman, the Hon. Timothy J. McCann, and the Hon. Bradley J. Waller, Judges, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | John D. Silk and Michael J. Wall, both of Rothschild, Barry & Myers LLP, of Chicago, for appellant. |
| | Jeffrey D. Ganz and Philip J. Block, both of Riemer & Braunstein, LLP, of Chicago, for appellee. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion. Presiding Justice Burke and Justice Hudson concurred in the judgment and opinion. |

## OPINION

¶ 1 Bank of America, as successor by merger to LaSalle Bank National Association (LaSalle Bank), filed a mortgage foreclosure complaint against Home Depot U.S.A. (Home Depot), *et al.*, to enforce various lending agreements that Bank of America had with Cannonball LLC (Cannonball), in connection with the development of the Kendall Marketplace shopping center (shopping center), a multibuilding, multitenant commercial development in Yorkville, Illinois. Home Depot's counterclaim sought, *inter alia*, a declaration that, pursuant to its agreements with Cannonball, it had certain covenants that ran with the land and were binding against Bank of America. Bank of America and Home Depot filed cross-motions for summary judgment. The trial court determined that the covenants at issue did not run with the land, granted summary judgment in favor of Bank of America, and denied Home Depot's motion for summary judgment. Subsequently, the trial court entered an order confirming the sale of the property at issue.

¶ 2 On appeal, Home Depot argues that summary judgment should have been granted in its favor and denied to Bank of America. Home Depot argues that the covenants run with the land and bind Bank of America pursuant to the explicit terms of the pertinent recorded

documents and the sequence of recording those documents. We agree and reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4        In the spring of 2007, Cannonball entered into various agreements leading to the development of the shopping center. LaSalle Bank and Cannonball entered into a construction loan agreement for the purpose of acquiring real property and constructing the shopping center. Around this time, Cannonball sold certain tracts (anchor tracts) within the shopping center to Home Depot, Target Corporation (Target), and Kohl's Illinois, Inc. (Kohl's) (collectively, the anchor stores). Cannonball retained the central and remaining outlying portions of the shopping center for sale or lease to other retailers, and it retained roads, driveways, sidewalks, and parking areas that were not part of the anchor tracts. The construction loan agreement was secured by a mortgage in favor of LaSalle Bank and granting a lien on Cannonball's property (the mortgaged property), consisting of the shopping center except for the anchor tracts.

¶ 5        Also around this time, Cannonball and the anchor stores together entered into an operation and easement agreement (OEA) that granted nonexclusive easements to, *inter alia*, parking, driveway, and sidewalk areas of each party's tract and the "Common Drive." Section 6.7 of the OEA provides:

> "The terms of this OEA and all easements granted hereunder shall constitute covenants running with the land and shall bind the Parcels described therein and inure to the benefit of and be binding upon each Party."

¶ 6        In addition, Yorkville issued and sold bonds to provide money to assist in the development of the shopping center with on- and off-site improvements. To recover the money, Yorkville imposed against all tracts within the shopping center a special tax that was called the "Special Service Area Tax" or the "SSA tax."

¶ 7        Cannonball and the anchor stores entered into separate purchase agreements. In March 2007, Home Depot and Cannonball entered into a "Real Property Purchase Agreement" (purchase agreement) under which Home Depot purchased from Cannonball approximately 10 half-acres of land in the shopping center. Paragraph 20(l) of the purchase agreement provides:

> "(l) Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the respective successors and assigns of the parties hereto (as permitted pursuant to the provisions of this Agreement)."

¶ 8        Pursuant to the purchase agreement, Cannonball agreed to reimburse Home Depot for part of the SSA tax Home Depot paid (reimbursement right). Paragraph 22(h) of the purchase agreement provides:

> "Seller hereby agrees that Seller shall be obligated to reimburse Purchaser for any portion of such SSA tax assessment which exceeds an amount equal to $0.50 per square foot of Purchaser's Floor area (as defined in the OEA), exclusive of the garden center. If Seller fails to pay any such excess SSA tax assessment within thirty (30)

- 3 -

days after Purchaser bills Seller therefore, then in addition to any other rights and remedies available to Purchaser, Purchaser shall have lien rights against Seller's land in the Shopping Center in accordance with the terms of the Development agreement. The terms of this Section 22(h) shall survive the Closing and shall be included in a memorandum of agreement to be executed, delivered and recorded by Seller and Purchaser at Closing. The form of the memorandum of agreement shall be approved by Seller and Purchaser within the Inspection Period; provided, however, Purchaser agrees that the memorandum of agreement shall not specifically reference the economic terms of the foregoing reimbursement obligation from Seller to Purchaser pursuant to this *Section 22(h) which shall be a covenant which shall run with the land and bind Seller's grantees, successors and assigns including provisions regarding the SSA Tax.*" (Emphasis added.)

¶ 9    Cannonball and Home Depot entered into a development agreement, dated May 15, 2007. Section 7.8(c) of the development agreement provides in relevant part:

"[P]ursuant to Section 22(h) of the Purchase Agreement, Developer is obligated to reimburse Home Depot for any portion of such [tax] assessment which exceeds, in aggregate, an amount equal to $.50 per square foot of Floor Area ***. If Developer fails to pay any such excess [tax] assessment within thirty (30) days after Home Depot bills Developer therefore [*sic*], then in addition to any other rights and remedies available to Home Depot, Home Depot shall have lien rights against Developer's Property in accordance with the terms of this Agreement."

The development agreement also provides:

"12.1 *Grant of Lien*. Developer hereby grants and conveys to Home Depot a lien on Developer's Property to secure the performance by Developer of its obligations hereunder. Such lien shall be foreclosed in accordance with this Article 12.

* * *

12.4 *Priority*. The priority of a lien created pursuant to this Article 12 shall be established solely by reference to the date of the recordation of the Memorandum of Development Agreement pursuant to Section 17.4 below; provided, however, such lien shall be subordinate to the lien of any first mortgage or deed of trust.

* * *

17.2 *Binding Effect*. Subject to any provision hereof restricting assignment, this Agreement shall be binding upon and inure to the benefit of the executing parties and their respective successors, assigns, heirs, executors and administrators."

¶ 10    Cannonball, Home Depot, and LaSalle Bank entered into a payment and priority agreement, dated May 15, 2007, that provides, in relevant part:

"Lender shall have no obligations to the City or any of the Anchors under the Development agreements unless Lender expressly assumes Developer's obligations thereunder in writing."

¶ 11    On May 24, 2007, and in the following order, the following documents were recorded with the office of the Kendall County recorder: the OEA; a "Memorandum of Agreement"

- 4 -

regarding the purchase agreement between Cannonball and Home Depot; a "Memorandum of Development Agreement" regarding the development agreement between Cannonball and Home Depot; and the LaSalle Bank mortgage. The recorded memorandum regarding the purchase agreement provides, in part:

> "Notice is hereby given of the execution and delivery by the parties of the Purchase Agreement (which Purchase Agreement is hereby incorporated herein by reference). Notice is specifically provided that Developer has certain reimbursement obligations under Section 22(h) of the Purchase Agreement and that if Developer fails to comply with such obligations, the Purchase Agreement creates a lien on the property described on Exhibit 'B' in accordance with lien provisions contained in the Development Agreement. Developer's obligations under Section 22(h) of the Purchase Agreement shall be a covenant which shall run with the land and shall be binding upon Seller's grantees, successors, and assigns."

¶ 12      After Cannonball defaulted under the construction loan agreement, Bank of America filed a four-count amended complaint. Counts I through III, against Cannonball and David Bossy (Cannonball's loan guarantor), alleged breach of contract and sought money damages. Count IV, against Cannonball, Bossy, Home Depot, Target, and Kohl's, sought the foreclosure of the mortgaged property. Regarding Home Depot, Bank of America alleged only the following:

> "The recorded and unrecorded claims and interests of this Defendant, if any, including but not limited to any actual or potential rights to record liens or exercise any other rights against the Property, pursuant to the Home Depot Purchase Agreement, the Home Depot [development agreement] or any other agreements, are subordinate and inferior to the lien and interest of Agent."

¶ 13      Home Depot filed an answer to Bank of America's amended complaint, denying that its rights were inferior to those of Bank of America. Home Depot also asserted affirmative defenses alleging that the terms of its agreements with Cannonball "affected" Cannonball's land. In addition, with its answer, Home Depot filed a counterclaim against Cannonball, seeking $50,395.50, plus attorney fees and costs, and alleging that Cannonball breached the purchase and development agreements by failing to reimburse Home Depot for SSA taxes it had paid. This claim was later voluntarily dismissed without prejudice.

¶ 14      On February 28, 2011, Bank of America filed motions for default judgment, summary judgment, and judgment of foreclosure. Bank of America's summary judgment motion sought to foreclose and terminate Home Depot's tax reimbursement rights and lien rights as against any purchaser of the mortgaged property following the foreclosure sale.

¶ 15      Home Depot filed a counterclaim against Bank of America, seeking a declaration that Home Depot's rights under the purchase agreement, the development agreement, and the OEA ran with the land and were binding on the grantees, successors, and assigns of Cannonball, including Bank of America. Home Depot also filed a motion for summary judgment.

¶ 16        On October 9, 2012, after hearing argument from counsel, the trial court, Judge Alan W. Cargerman presiding, granted summary judgment in favor of Bank of America and against Home Depot. On May 1, 2012, the trial court, Judge Timothy J. McCann presiding, issued a written order of default judgment, summary judgment, and judgment of foreclosure and sale. The trial court stated:

> "Bank of America's Motion for Summary Judgment against Home Depot, as it relates to Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights is granted pursuant to 735 ILCS 5/2-1005. Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights are personal between Cannonball and Home Depot and do not run with the Mortgaged Property. Upon entry of the final order in this case, Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights and Home Depot['s] Claim of Lien are foreclosed and terminated pursuant to 735 ILCS 5/15-1506(c), provided, however, that Home Depot's Reimbursement Rights against Cannonball are not affected. The purchaser of the Mortgaged Property at foreclosure sale, as well as its grantees, successors and assigns, shall have no obligation to reimburse Home Depot, or any person(s) claiming by, through or under it, for any portion of the SSA Tax assessed against the Home Depot Tract."

Regarding Home Depot's counterclaim against Bank of America, the trial court stated:

> "Home Depot's Reimbursement Rights and Home Depot's SSA Tax Lien Rights are personal between Cannonball and Home Depot, do not run with the Mortgaged Property, and are not binding against Bank of America or any purchaser of the Mortgaged Property at this foreclosure sale, and Home Depot's Motion for Summary Judgment is denied as it relates to such rights. Home Depot's Motion for Summary Judgment is granted in regard to all other rights and obligations in the Home Depot Purchase Agreement, Home Depot Development Agreement and the OEA, which rights and obligations run with the Mortgaged Property and are binding on the purchaser of the Mortgaged Property at this foreclosure sale and its grantees, successors and assigns."

¶ 17        On April 1, 2013, Home Depot filed a motion to reconsider, which the trial court denied on May 23. On June 17, 2013, a judicial sale of the mortgaged property was conducted by the Kendall County sheriff's department, and Bank of America was the successful bidder. On July 17, 2013, the trial court, Judge Bradley J. Waller presiding, entered an order confirming the sale. On August 15, 2013, a sheriff's deed was executed conveying the mortgaged property to Bank of America. On the same day, Home Depot filed its notice of appeal. Home Depot filed an amended notice of appeal on August 23, 2013.

¶ 18                                    II. ANALYSIS

¶ 19        Home Depot argues that summary judgment should have been granted to it and denied to Bank of America because the covenants run with the land. Summary judgment is appropriate only where the pleadings, depositions, admissions, and affidavits, viewed in the light most favorable to the nonmovant, show that no genuine issue of material fact exists and that the

moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2010). "By filing cross-motions for summary judgment, the parties agree that no factual issues exist and this case turns solely on legal issues subject to *de novo* review." *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 73.

¶ 20    The threshold issue in this case is whether the trial court properly "foreclosed and terminated" Home Depot's tax reimbursement and lien rights based on its determination that such rights "are personal between Cannonball and Home Depot and do not run with the Mortgaged Property." Home Depot argues that the purchase and development agreements are binding on Cannonball's successors and that the covenants granting Home Depot tax reimbursement and lien rights run with the land. Bank of America essentially argues that the agreements are personal agreements binding only Home Depot and Cannonball.

¶ 21    Initially, we note that, during oral argument, Home Depot conceded that any lien it had against the mortgaged property for tax reimbursement payments that came due and owing before Bank of America obtained title to the property could not be enforced against Bank of America. See *Pembrook Condominium Ass'n-One v. North Shore Trust & Savings*, 2013 IL App (2d) 130288, ¶ 14. Thus, this case involves only whether Home Depot will be able to enforce its tax reimbursement and lien rights against Bank of America and its successors and assigns in the future. Therefore, we must determine whether the covenants at issue run with the land.

¶ 22    To determine whether a covenant runs with the land, a court looks to whether: (1) the grantee and the grantor intended the covenant to run with the land; (2) the covenant touches and concerns the land; and (3) there is privity of estate between the party claiming the benefit and the party resting under the burden of the covenant. *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 188 (1983).

¶ 23    In the case at bar, Bank of America does not contest that Cannonball and Home Depot intended the covenants to run with the land and there is no doubt that they intended such. Section 22(h) of the purchase agreement provides that the tax reimbursement and lien rights "shall be a covenant which shall run with the land and bind [Cannonball's] grantees, successors and assigns." In addition, section 20(l) of the purchase agreement provides that the purchase agreement "shall be binding upon *** the respective successors and assigns of the parties." Further, section 17.2 of the development agreement provides that Cannonball's obligations are binding on its successors and assigns. Moreover, the recorded memorandum of the purchase agreement states that Cannonball's obligations under section 22(h) of the purchase agreement are a covenant to run with the land and "shall be binding on Seller's grantees, successors, and assigns." A covenant should be interpreted to give effect to the parties' intent when the covenant was made, as determined by its express provisions. *Id*. Accordingly, we conclude that Cannonball and Home Depot intended the tax reimbursement and lien rights to run with the land.

¶ 24    Regarding the second part of the test, a covenant touches and concerns the land if it affects the use, value, and enjoyment of the property. Home Depot argues that this case is like other cases that have held that covenants to pay money, taxes, or fees affect the use, value, and enjoyment of property. Bank of America argues that Home Depot's tax

reimbursement and lien rights do not touch and concern the land, because these rights are "purely financial covenants" that do not affect the property's use or enjoyment, increase or decrease its value, or affect any action to be done or allowed on the property. Bank of America's labeling of the covenant at issue here as "purely financial" is unpersuasive.

¶ 25    In *Streams Sports Club*, our supreme court held that an agreement to pay fees for a recreational facility, which was adjacent to a condominium complex and part of a common building plan, touched and concerned the land. The court explained:

> "The sports club is part of a common building plan that the defendant was aware of at the time she purchased her unit. Condominium owners can enjoy the benefits of convenient sports facilities and also have the burden of furnishing the $216 annual fee." *Id.* at 189.

¶ 26    In *United States Fidelity & Guaranty Co. v. Old Orchard Plaza Ltd. Partnership*, 284 Ill. App. 3d 765 (1996), the plaintiff leased property from an owner that later defaulted on its mortgage. *Id.* at 767. Prior to default, the plaintiff exercised its right under the lease to vacate the premises and receive a "termination payment." *Id*. The defendant bank foreclosed on the property, and the plaintiff filed an intervenor's complaint seeking a declaratory judgment that one or more of the defendants were liable for the termination payment. *Id*. at 768. The trial court dismissed the plaintiff's complaint. *Id*. at 771. On appeal, the plaintiff argued that the termination payment provision was a covenant running with the land. *Id*. at 777. The appellate court determined that the plaintiff "adequately allege[d]" that the covenant touched and concerned the land. *Id*. The court reasoned:

> "Here, the covenant requiring the landlord to pay the tenant $2 million if the tenant does not exercise an option to extend the term of the lease directly affects the value of both the leasehold and of the property. Clearly, without such a provision, the leasehold is worth less, and the fee simple is worth more." *Id*.

¶ 27    In *C-B Realty & Trading Corp. v. Chicago & North Western Ry. Co.*, 198 Ill. App. 3d 926 (1990), the plaintiffs, successors in title to a freight warehouse property, filed suit against the defendants, successors in interest to a railway. *Id*. at 929. The parties' predecessors in interest entered into a contract allowing for the building of a railway bridge over the warehouse, and the defendants' predecessors promised to pay three-fourths of all taxes levied against the warehouse property. *Id*. The contract provided that the parties agreed that the contract would be binding upon, and inure to the benefit of, the parties to the agreement and their respective successors and assigns. *Id*. at 932. After trial, the trial court entered judgment in favor of the plaintiffs, and the appellate court held that the defendants' promise to maintain a watertight bridge ran with the land because it affected the enjoyment of and directly concerned the land. *Id*. at 930-31. The court stated:

> "Similarly, in regard to the [payment of] taxes, such a promise relates directly to the land itself and the use thereof. Payments made in connection with the use or ownership of land have been found to be covenants running with the land. [Citations.]" *Id*. at 931.

¶ 28    In *McAnelly v. Graves*, 126 Ill. App. 3d 528 (1984), the plaintiff entered into a coal lease and made an advance royalty payment to the original lessors, who then sold the leased property to the defendants. *Id.* at 530. One of the defendants terminated the lease without refunding to the plaintiff the advance royalty payment as provided by the lease, and the plaintiff sought recovery against the defendants and the original lessors. *Id.* The trial court dismissed the plaintiff's claim against the defendants. *Id.* On appeal, the plaintiff argued that the original lessors' promise to refund part of the advance royalty payment upon termination of the lease was a covenant running with the land. *Id.* at 532. The defendants argued that the obligation was personal only to the original lessors, who had received the advance payment from the plaintiff. *Id.* The appellate court reversed the trial court's dismissal of the plaintiff's claim. *Id.* at 536. The appellate court explained:

> "While a grantee will not be bound by a covenant in the lease that is merely personal and collateral to the leased property, both the grantee and the lessee will be bound as against each other by covenants affecting the use, value and enjoyment of the property in question." *Id.* at 535.

The court further explained that both the benefit of the right of early termination and the burden to repay advanced royalties ran with the land. *Id.* at 535-36.

¶ 29    In this case, there is no doubt that the covenants at issue touch and concern the property as a matter of law. Home Depot's tax reimbursement and lien rights are part of agreements that Bank of America's predecessor was aware of when it entered into the construction loan agreement with Cannonball. See *Streams Sports Club*, 99 Ill. 2d at 189. Home Depot's tax reimbursement and lien rights directly affect the value of both the mortgaged property and Home Depot's property. It is axiomatic that, without such benefits, Home Depot's property is worth less and that, without such burdens, the mortgaged property is worth more. See *United States Fidelity*, 284 Ill. App. 3d at 777. Cannonball's promise to pay part of Home Depot's taxes "relates directly to the land itself and the use thereof" (*C-B Realty & Trading*, 198 Ill. App. 3d at 931) and is not simply a personal financial obligation between the parties. See *McAnelly*, 126 Ill. App. 3d at 535-36. Therefore, Home Depot's tax reimbursement and lien rights touch and concern the property.

¶ 30    Regarding the third part of the test:

> "Privity of contract or estate has been defined as 'mutual *or successive* relationship to the same rights of property.' (Emphasis added.) [Citations.] The relationship may be by operation of law, by descent, or by voluntary or involuntary transfer. [Citation.] Privity of contract is '[t]hat connection or relationship which exists between two or more contracting parties.' [Citation.]" *Collins Co. v. Carboline Co.*, 125 Ill. 2d 498, 511 (1988).

Bank of America does not contest that there is privity of estate between Home Depot and Bank of America. We determine that Bank of America and Home Depot share a mutual relationship to the shopping center's common areas by virtue of the purchase agreement, the OEA, and the development agreement and that, thus, privity of estate exists. See also *St. Paul Federal Bank for Savings v. Wesby*, 149 Ill. App. 3d 1059, 1064 (1986) ("[T]here is privity of estate in this case–that is, a chain of privity between the original covenantee, covenantor,

and the subsequent parties to be bound by the covenant."). Therefore, in sum, Home Depot's tax reimbursement and lien rights are covenants that run with the land.

¶ 31    Bank of America argues that, assuming *arguendo* that Home Depot's tax reimbursement and lien rights run with the land, those rights were properly terminated because they are inferior and subordinate to Bank of America's mortgage. More specifically, Bank of America argues that all inferior and subordinate liens are extinguished by foreclosure, even if they run with the land. Bank of America cites *State Life Insurance Co. v. Freeman*, 308 Ill. App. 127 (1941), to support its argument. In *Freeman*, the appellate court held that a restrictive agreement that the defendant claimed to run with the land did not bind the mortgagee upon foreclosure. *Id*. at 144. The court reasoned that the restrictive agreement was recorded subsequent to the recording of the mortgage and that the mortgagee had not assented to the restrictive agreement. *Id*. In this case, the LaSalle Bank mortgage was recorded on the same day, but after, Home Depot's memorandum of the purchase agreement and memorandum of the development agreement were recorded. Further, LaSalle Bank had actual knowledge of the documents containing Home Depot's tax reimbursement and lien rights before it recorded its mortgage, because the purchase and development agreements were part of the closing documents. The effective date of a mortgage is the date of its recording. *Aames Capital Corp. v. Interstate Bank of Oak Forest*, 315 Ill. App. 3d 700, 703 (2000). Thus, Home Depot's tax reimbursement and lien rights, being in effect before the mortgage and running with the land, were not extinguished by foreclosure.

¶ 32    Next, Bank of America argues that Home Depot's tax reimbursement and lien rights were extinguished pursuant to the language in section 12.4 of the development agreement, which provides: "such lien shall be subordinate to the lien of any first mortgage or deed of trust." Home Depot argues that the meaning of the language is that the construction loan was to be paid before Home Depot's lien could be enforced.

¶ 33    The intent of the parties is our primary objective when construing a contract. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232 (2007). The best indication of the parties' intent is found in the plain and ordinary meaning of the language of the contract. *Id*. at 233. We will not "alter, change or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented." *Thompson v. Gordon*, 241 Ill. 2d 428, 449 (2011). Nothing in the provision at issue indicates the parties' intent to extinguish Home Depot's tax reimbursement and lien rights. Neither the word "extinguish" nor any word with a similar meaning is contained in the provision. Rather, the plain and ordinary meaning of the language indicates only that Home Depot's lien was "assign[ed] a lower priority" (see Black's Law Dictionary 1467 (8th ed. 2004)) than Bank of America's first mortgage lien. Therefore, Home Depot's tax reimbursement and lien rights were not extinguished by section 12.4 of the development agreement.

¶ 34    Bank of America also asserts that Home Depot's rights were extinguished by a provision of the payment and priority agreement:

> "Lender shall have no obligations to the City or any of the Anchors under any Development Agreements unless lender expressly assumes Developer's obligations thereunder in writing."

Bank of America ignores that this provision does not exclude obligations under the purchase agreement and that it is the purchase agreement that grants Home Depot tax reimbursement and lien rights. Thus, the provision has no effect on the covenants at issue.

¶ 35    Accordingly, Home Depot's tax reimbursement and lien rights are covenants that run with the land and bind Bank of America. Thus, the trial court erred by granting summary judgment in favor of Bank of America and denying Home Depot's motion for summary judgment.

¶ 36                               III. CONCLUSION

¶ 37    For the reasons stated, we reverse the trial court's order granting summary judgment in favor of Bank of America and denying Home Depot's motion for summary judgment. We enter summary judgment in favor of Home Depot and against Bank of America. The cause is remanded for further proceedings consistent with this opinion.

¶ 38    Reversed and remanded.